Good morning, may it please the court. Brett Stone, Paladin Law Group, counsel for Appellant, the City of West Sacramento. I would like to reserve four minutes for rebuttal. Your Honors, this case is about insurance coverage for a plating shop that caused a plume of contamination in the heart of the city. The city is seriously concerned about the urban blight. Something has to be done. So the city filed a lawsuit, and it prevailed. And Arrowood, the insurance company who defended and controlled the case and the underlying action, negotiated and signed a settlement agreement that moved this case to where we are today. And in that agreement, Arrowood agreed that, through a judgment, that its insurance caused the contamination issue and that they were liable for the contamination issue. So the issue in this case is whether just to pause you, I mean, yes, the stipulated judgment is what led us to this insurance proceeding. But is there anything about that stipulated judgment that bears on the questions of essentially contract interpretation that we're doing here? Well, yes, Your Honor. There's that stipulated judgment included an underlying cause of action for nuisance. And it was found in that stipulated judgment and the findings of fact and conclusions of law incorporated therein that there was a substantial factor that caused the contamination. And substantial factor is relevant to whether any one of these sudden and accidental events that took place at the site, the two fires, the 10-inch rainstorm, the 5 to 10 breaches of the earthen dam, all of these occurrences. So I'm following you all the way until this last step. It makes sense to me that they would say our client, Merrill Woods' client, I forget their name, caused the pollution over all those years that they operate and that that pollution was a substantial, that their activities altogether were a substantial factor. The difficulty is it seems to me you want to take that and tie it to each one of these individual things, you know, I think there's eight or something like that, and say that that somehow was some sort of concession that each one of those was a substantial factor. But it doesn't necessarily follow. One doesn't follow from the others, best I could tell you. Saying that we, yes, we caused the pollution generally and that our cause of it was a substantial factor and the pollution isn't the same as saying that any individual one of those things was a substantial factor. Well, this is where the analysis of the District Court and Erwin's arguments are flawed. There is no requirement that anyone has to prove the amount of each one of those sudden and the quantification issue is simply not a requirement. The District Court and Erwin in his briefing relies on the state versus all state matter. That case doesn't say anything about quantification. In fact, it says that the insured is not required to prove how much of the contamination each individual release caused. It said, in fact, it disapproved finding fundamentally flawed a court of appeals case that required any proof of the amount. So what we need here to prevail, Your Honor, what the city needs to prevail is to show an occurrence. There are occurrences. And then the next question is, okay, so we have occurrences. Did these occurrences cause substantial harm? And substantial harm doesn't mean a really big spill. It doesn't mean, you know, that it was gallons and gallons of fluid or buckets of metal particulates. It's any harm. Well, are you jumping to the, you know, the exception to the exclusion, the sudden and accidental? That is the part of the sudden and accidental component of it. Let's focus on occurrences just for a minute because we just have to, before we go anywhere, we have to talk about occurrences. Because you just said, I'm trying to follow you on the substantial fact. You said substantial factor doesn't mean really, really big. And I guess I probably agree with that in the That's where I kind of, again, I kind of lose me because it seems to me it's got to be a substantial factor. It can't just be any, I mean, I don't think substantial factor means any harm at all. It means real harm. It doesn't mean, it means more than theoretical, more than infinitesimal. That's what it means. So an injury, here's the best example I can tell you with environmental law. A tablespoon of a hazardous substance is enough to contaminate an Olympic-sized swimming pool to a point where it's above action levels. And here we know that this is a real harm because the state regulatory agency in charge of looking out for environmental issues like this issued an imminent and substantial endangerment ordering the insurance to investigate and clean up the contamination. Is this helpful? Because maybe, maybe a, is your argument basically, so let's talk about the fire thing for a second because, you know, the difficulty with the fire, I think that's where the substantial factor is, you know, if the areas were pretty clean, but obviously I'm sure not surgically clean, and there was some pollutants in there and there was a fire and they, and a little bit gets out, ignoring the tanks or whatever, anything getting into the tanks, that's a, but just because the tiny bit of dust in the corner that hadn't been swept up or something. Your position is, is if there was any pollutant at all, then that would be necessarily a substantial factor? Is that? Yes, your honor. It's more than just a little bit not caught in the corner. There would be particulates in the rafters. There was a dust collector, a unit that held these. So make sure you understand what I'm asking. Because what I'm asking is, let's assume there was one particle, you know, I'm trying to figure out where you're, where you're drawing this line for what counts as substantial factor, because you're basically saying, well, yeah, but there'll be out here and there. And when you add it all up, I'm just trying to figure out how much counts as a substantial factor under your argument. It's not a quantification, your honor. It's a result. It's the injury. If it's enough to require cleanup, then it's a substantial factor. That's where we are. Okay. But you know, let's say, let's say there was a teaspoon, you went and collected all the dust from, from the grinding or whatever. And because it sounds like they'd cleaned up most of it, but you know, there's going to be a little bit, and there was a teaspoon of this dust, right? And then all of a sudden I throw the dust up in the air. It'd be hard to see that that alone would be, would require a cleanup, right? Consider the analogy I just gave you, using it in a liquid form. One tablespoon is enough to contaminate two action levels, an entire Olympic-sized swimming pool. I think there's a difference between, I mean, I'm just trying to, I think I have your argument, right? I'm just trying to figure out, like, where the, where the limit of it is. Because I don't, if it's got to be a substantial factor, it seems to me it can't just be, that has some threshold, right? I mean, that's the whole purpose of having that test, is it has some threshold. There needs to be appreciable harm, but we know that harm exists because the property is contaminated. The evidence that we have of how it became contaminated. The difficulty for you seems, seems to me that we know the property's contaminated from a whole bunch of stuff, right? And so trying to find out whether any one of these individual things was a substantial, that's the difficulty, right? That's what I'm struggling with. Well, remember, Your Honor, it's not a comparison into the entirety of the site. The issue is, and there's evidence of this in the record, any one of these things on their own would have caused harm. That's what I'm struggling with. I get your point that it's not a comparison in the sense of if it, you know, if you poured 5,000 gallons of some horrible thing, the fact that you might have had a gallon, that might too have been a substantial factor because a gallon alone of it would have been bad. But, but what I, what I'm struggling with is it sounds like earlier you're relying on the fact that the site's contaminated. Therefore, it was, this particular thing was a substantial factor. But can we really do that? Can we just say the site's, when there, when there were many other things that could have contaminated the site beyond, say, the fire. Let's use the fire as an example. There are many, though. There's the five to ten breaches of the earthen dam. There's the container. Let's use the dumpster as an example. It was put into a containment system. There was no plan to have it leave that system. It was planned to be carried away from the site. It was not expected that there would be contamination in that area. I'm not sure I'm clear on something. Do you, do you agree that there was contamination on this site that is not caused by any of the, any things that you are alleging fit within, you know, fit within a sudden accidental or? There, there are, there's a long history of contamination and use of this site. We do, we'll never know all the details of how the various events took place. But that becomes a shifting burden to the insurer to argue that any one of these things can be isolated, that they can be, that they are divisible to show that, hey, we're not liable for the whole thing. And there's no evidence that, that there is any divisibility. I think you're, I think you are coming from a point where you're not going to get anywhere. I think that if you want to say that all these 20 years of contamination are sudden and accidental or not expected, I think you're going to have a big problem. I think you might want to concentrate from my point of view on what the fire and the flood did. Those sound like real accidents to me, not expected. And it seems to me there, there's better hope for you on those. Sure. From my point of view, not speaking for anyone else. We can talk about the fire, the flood, and certainly the five to 10 breaches of the earthen dam. You can hardly say that the first time that happened, the first two times, and maybe three times that that would be expected. The testimony was the dam was put there to stop it, to prevent it. That was the objective. So there was, there was no expectation that that dam was not going to be successful. Now we are jumping a little bit because, you know, there's an occurrence issue and there's a burden of proof part of our argument that we need to talk about. The burden of proof on the occurrence issue was mixed up by the district court. The burden of proof in the basic scope of coverage. But within the language of the definition of occurrence, there's a carve out, that carve out of unexpected and unintended, that burden shifts to the insurer because it's exclusionary. Right. Well, let's, let's go back if we can to the exclusion, to the exception, to the exclusion, because even if you can get past this and say it was an occurrence, we still have to deal with that. The, you know, the standard from all data is that if something is sudden and accidental, but it contributes only trivially to the, to the property damage, then it's not a substantial cause. And so if we assume you have, you know, the difficulty with this property is that there were a lot of things going on with it over time. And some of them seem more sudden and accidental than others, like the fire and the flood or the rainstorm, that seems sudden and accidental. Seepage over time seems less sudden and accidental. If we isolate this to the fire and the rainstorm, what evidence, what evidence is in the record that would help us to conclude that those two events or sets of events were substantial cause, that it was more than trivial? Well, Your Honor, the, the, the triviality part of it is, again, it, we have evidence that any one of these events, and we'll start with, let's use a fire. The, the first fire, the place burned down, what burned down? Where they're grinding and polishing, and they have metal finishing dust. It's in the rafters, it's on the walls. Yes, they make an effort to clean it up. That's the jobbing room? It's called the, the metal finishing room, I believe. But I think they call it, there's a jobbing area in that location as well. And this, this area's burnt to the ground, and there's fire extinguishers, and there's... Is it total loss? It's a total loss of that building down to the ground. That's part, that's part of the overall complex? That's part of the overall complex. And this happens twice. This happens again in 1985. This time the plant doesn't... When was the first time it happened? Seventy-three. So then it was rebuilt, and then it happened again? Correct. And there's, you know, there's our efforts in the record about an effort to, to sweep up. That's not, certainly not a perfect science. It's not getting everything everywhere. Plus there's a dust collector. Imagine a big vacuum, and let's say that vacuum bag is there. There's certainly dust in that, blown everywhere. And the record shows that this alone would be something that would be create, this release would be enough to require regulatory agency investigation and cleanup. And by itself... The records, if I remember right, I think the expert from the insurance specified that, you know, even assuming that there was, you know, dust on wrappers and so that it would, that some tiny little amount, I mean, it doesn't... Again, this is to the proof of how much. There's no proof of, of any quantification. If you look at that section of, of state versus all state, it specifically says it disapproves of any concept. Right. I, I agree with you that if it was enough that it had to be cleaned up, the difficulty is I'm, what I'm, I think what we're probably all struggling with is if that alone was the only thing that had happened, and otherwise the site was pristine, and not, it had not been flooded any other way, there had been a fire, would that require the cleanup efforts? That's kind of what I think you have to show. Exactly. And I think that's what we have shown, and what we, the result is, is all commingled, and there's no effort, there's no ability to say what's not included there. So all we know is that alone would have contributed to cleanup. Didn't they have an expert that, that test, that, that testified, at least, this is how much it would have contributed, and that would, that would... Through a, through a... Imprecisely small. Through a quantification process that isn't the, is, was taking the that fire, let's use the, let's say it's the 1973 fire, and comparing it to the entirety of the whole site, not just in that location. The whole area, off property, in the ground water, based on, you know, just that. So that quantification effort was flawed. And let me just say, even if the... What thing that burned down, in its entirety, was not a place they were using fluids, right? It was a grinding, dusting area? Not, not a plating area, not a fluid area? Correct. The fluid area was next door, where the, where the five to ten... So we're talking about part, dust and particulates, not stuff that's going into the ground water. That's not true, Your Honor. These, these are metals. So the, these metals do migrate both in liquid form and, and in solid form. And even, by the way, speaking of ground water, even if... How do they get, how do the metal dust get into the ground water? The, it leaches through the ground water, through rain and otherwise, and migrates from the soil to the ground water. And by the way, the ground water... Hey, wait, we're talking about the fire, not the flood. So... Oh, I know, but the flood comes after the fire. So it's pushing all these contaminants in the soil down into the ground. I see. Through the soil. And ground water is not within the pollution exclusion. We've briefed this. It is, it is not part of it, and it doesn't matter, and there's no logical reason why ground water should be considered a water course. It doesn't have defined channels. Okay. If the pollution is upon the land, and then it leaches into the ground water. That's the, this is the concept that the district court came up with, and it's just not a workable concept. The, the initial release location is not what you should think about. Let's use the fire. Let's imagine that these particulates started indoors, right? And then all of a sudden, that indoors became outdoors because of the fire. Do those, are they excluded? But does it really matter? If the fire and the flood are accidental, then it doesn't matter if the exclusion doesn't apply because it's an exception to the exclusion, right? Right, but from the ground water perspective, if ground water isn't a factor, it doesn't matter where it begins. Let's say that those metal particulates were carried up in the air, traveled next door to a crop of lettuce, and that lettuce was, which is not land, not atmosphere, not a water course, is contaminated, is damaged. Under the district court's ruling, that would be excluded under the pollution exclusion, and that's not what a reasonable insured would expect their policy to say. You know, and same thing, let's say it went through, migrated underground to a swimming pool and contaminated the concrete and the pool water. That, is the pool now excluded under the ground water? I don't understand why you're saying, why is the coverage of the exclusion so important if an exception applies? Because we're not only talking about ground water. We're talking about the soil and ground water contamination. I see it going into my reserve pocket. We'll let you have some time, so why don't you save your time for rebuttal, if that works, and we'll hear from your opposing counsel. May it please the court. Alex Petente for Arrowwood. The court focused, Mr. Stone, on a couple of points that I think it's worth discussing, and that's the fire and the rain event. The state, or the city, has not offered, in the record, any evidence of causation from these events to create property damage or pollution at the property. Before you even get into the pollution exclusion and the sudden and accidental exception, they have to prove an accident that caused pollution. That's the insuring agreement of the policies that Arrowwood issued. The state, the city, carries the burden of proof. They have to prove that a reasonable jury could actually find for them, based on the evidence that they've asserted. What we have for the fire and the rain event, for the fire, we have a property that was cleaned and burned, an area that was burned, and the record's not entirely clear, it was burned totally to the ground. More importantly, there's no evidence of a release of metal particulates from the fire or firefighting. Most importantly, this quantification piece, I don't understand how you can have a showing by the city who carries the burden of proof that something was nontrivial, that it was appreciable, that it was a substantial factor in the defendant's liability, if they can make no showing that it's unknowable, says their expert, how much material was released. So if something is unknowable, how can a party prove to a jury that that was a substantial factor, that that was appreciable, that that was not de minimis? And I would respectfully submit to the Court that that is a failure, that it fatally flaws their appeal, that if they have to prove that something was a substantial, that a certain accident caused a release that caused property damage, pollution, and they have no way to the total amount of pollution at the site, which admittedly came from a variety of different polluters and a variety of different sources, most if not almost all or all were not sudden and accidental caused by an occurrence, then they can't, the city can't meet its burden to establish that the fires or the rain event or any of the other putative occurrences were substantial factors in the defendant's liability for pollution at the site. So that's my primary point, Your Honor, Your Honors. You understand that he is disputing that these things were not occurrences. I think he's saying that from day one they were occurrences. So that's wasn't where my question was, but that's what he's arguing. Sure. So I think there are two different points here. One is, are the events occurrences at all? So we have, I think there are a half dozen, six or seven different kinds of events. You've got the two fires, the rain event, and Judge Shub found that these were accidents. We dispute that in our papers, but I won't belabor that point here. Accidents and did he find they were occurrences? Yes, he found they were occurrences. The insurance that your client provided, it obviously wasn't pollution insurance. It most excluded pollution. It was just like general liability insurance? General liability insurance. I assume that your insurance probably actually covered the fire part, right? The property damage from the fire would have been covered. There was never a claim. So it seems weird to say that it's not an occurrence. If it wasn't an occurrence at all, you wouldn't have covered the fire. I would draw a distinction between the release of contaminants from a fire and the property damage that occurred from a fire. So the traveler's case, to be said, in our papers... I don't know if that makes a whole lot of sense to me, because it seems to me the whole purpose of this coverage is your company saying, we're going to provide general liability, we'll cover you for fires, we'll cover you for earthquakes, I don't know. But what we don't want to cover you for is slow pollution. Now if a fire comes in and this accidental fire also pollutes, then we'll cover it. That's why you have the accidental. And so it seems odd to me to sort of draw a distinction between something as an occurrence. Yes, it was an occurrence in the sense that it burnt the building down, or it was an occurrence in the sense that this wind came in and knocked over our whole building. But it's like a separate inquiry as to whether or not it was an occurrence for pollution purposes. Because if it knocked the building over, knocked these tanks over, and they go into the river and everybody dies, that would be, it seems to me, the same occurrence. It would apply to both. The one court that has addressed this, the traveler's case, which you said in our papers, found that the act of firefighting, if the firefighters were using water to disperse pollutants, that that is expected or intended. And so that does not meet the definition of occurrence. Whereas the fire is not expected or intended. The firefighting and spraying water into an area where known pollutants are is expected or intended. But I would submit that there's no proof that there were known pollutants in any meaningful amounts in the areas that actually burned these fires. I mean, doesn't it kind of come down to that? I mean, I don't think all state requires them to quantify something, but if they were able to come in and say the room that was completely consumed by fire was full of thousands of barrels of highly toxic fluid, okay, you know, that's a different situation. It seems to me that what this turns on is what kind of materials were used in those rooms at the time these events occurred. I agree with that. So what does the record show specifically? Walk through for each, the two fires and the flood. What does the record show as to what that part of the building was used for? Sure. So for the two fires, it was the polishing, grinding, and jobbing rooms. Any fluids? No fluids. And those rooms were cleaned daily, the record shows. And there is no evidence that there was an appreciable amount of dust. Our expert made an attempt to quantify the maximum amount of dust that might be there on a given day at the end of the day. And we used that to argue that even if the maximum amount of dust were there, that would not be actionable. What were the inputs to the experts? How did he come to that determination? He used the amount of bumpers that were polished and ground in the rooms and took an assessment of the average size of the grinding and polishing and then the amount of nickel, metal, and chromium that were contained in the bumpers. So these are old bumpers that are ground down before... Did he assume any cleaning occurred? He did assume that some cleaning occurred, but he was generous with regard to the amount of dust particulates that were left in the room. Okay. So those are the two fire events? Those are the two fires. And then... Is there any distinction between the two fire events? We have very little evidence about what happened in the 73 fire. Because of the timing, because it's 49 years ago, there just is very little in the record about what actually occurred at that fire. With regard to the rain event, there is no evidence that there was any material left. The equipment had all been removed prior to the rain event.  Well, that's another... There also is no evidence that there were actually structural impairments to the roof. Judge Shub assumed, for purposes of the summary judgment motion, that there were holes in the roof, taking the facts in light most favorable to... In rooms that used both particles and fluids? In rooms that used both particles and fluids. But at that point, the facilities had stopped operating and the fluid containers had all been removed. The tanks had all been removed. There were 15... Because the business had closed? The business had closed. That's correct. And so they didn't rebuild after the second fire. So at that point, even if there were holes around the building, the city's theory is that the rain would have washed whatever was on the surface of the concrete deeper into the concrete. And Judge Shub reasoned that if there were any contaminants sitting on top of the concrete in the tank area, there was still a drain there, it would have washed them down the drain the way they had done for the last 30-some years. Because the concrete barriers were still there around the tanks? Right. The concrete curb that Stockton Plating had constructed was still intact at that point. That's the tank room. And then the jobbing room, which is where even the second fire actually started or something, I take it their theory is the dust that was left in that room, even though it had been shut down and any dust that was left in that room, that would have been washed out by the rain or something like that and caused... Again, I suppose that's correct. That was what your expert... That's the number that your expert... He did assume that all of that dust would be washed out by the rain. That was his assumption. So, those are the two putatively accidental events per Judge Shub's order. The other events... Just to be clear, the rain, the second fire and the rain are kind of related, right? Because as I take their argument, there was a fire, and I suppose the idea would be firefighters may have washed stuff out, but then in theory the roof was damaged and then a rain came later and washed more out. So, but they would be related. Wash whatever medical particulates that were left. I guess it rained... Because the rain event, my understanding is the reason the rain event wouldn't have just fallen on a roof that was blocked all the rain was because in theory the roof may have been damaged by the fire. That's right. And on the first one, the first fire, which it sounds like we don't know a lot about, it wasn't necessarily a rain event related to that one. It's just the idea is that the spring of the hoses may have sprayed. Correct. There's no evidence that the rain had any impact after the reconstruction of the first fire. I would make the following observation about rain. The sudden and accidental exclusion does require the release to the environment to be sudden. Release to the concrete is not release to the environment. It's the release from the concrete into the ground that we're discussing now. And so another question this court has to grapple with is, is the release, if it were rain and if it rained on metals that were deposited from fire or some other source on concrete and the rain drove them, created hydraulic head that pushed them through the concrete more than they were already there or drove them deeper into the ground. Is that a sudden event? Is it something that happened abruptly? And just, I mean, again, the movement of metals through porous concrete is not something that happens suddenly. It's something that takes a while. The flood makes it happen. It's sudden, even if it takes a while for the, to the actual harm to finish happening. But the release to the environment has to be sudden. That's what the case law holds. So the nature of the release has to be sudden. You can't just simply have a gradual release, something that permeates a porous surface over time. Leaking underground storage tanks are an example of that. I take it the reason you're making this argument is for the, for the fluids room, half the fire, assuming the roof was damaged and you're saying there was a rainfall and it somehow washed down and washed everything onto this concrete. By that point, you no longer have this earthen barrier thing, right? You have actually a concrete, a concrete barrier that is supposed to be making everything go down this drain. Correct. That's right. That's right. So if the rain got through the roof and washed everything down onto this concrete thing and whatever rested on the concrete and didn't go down this drain, your argument is that that stuff, even though the rain put it there, washed it off, washed dust off the rafters  would not be sudden and accidental, even though the rain was sudden and accidental. That's correct. And there's also a case law that says rain is not a sudden, I'm sorry, it's not an accidental event. I mean, rain in the... I think we're talking, we're assuming for purposes of summary judgment, this was like a flood, a rain, a flood type rain. Respectfully to the district court's decision, there are, I mean, typically in the wintertime in the Sacramento area, they have rainstorms. It happens almost every winter that there's a, you know, four or five inch rainstorm that occurs. This was supposed to be a 10 inch rainstorm. And I thought for purposes of summary judgment, they assumed that it was an unusual accidental event. That is certainly what Judge Shub found. I would just question whether any rain in the Sacramento area in the wintertime is really an accidental event. It's just part of weather and it's not hurricane force, certainly. Well, I mean, a rain event generally around here is somewhat unexpected to begin with. So a 10 inch rain sounds fairly unexpected. I get it. To the extent that this is a factual dispute, I won't argue with Your Honor. Yeah, and Gordon, I was going to add to that is it seems to me that the key issue here would be the rain in conjunction with, in theory at least, taking the record in the light most favorable, that it would be rain falling on a roof with holes in it. And so that to me seems to be the unexpected sort of accidental aspect. Right. And so again, I think that the issue before the court is really whether there's enough evidence in the record that there were material appreciable, non-trivial amounts of metals in the grinding, polishing, and jobbing areas that could have given rise to the pollution that exists at the property such that they were a substantial factor. There's a couple of just significant facts that are fair on this, it seems to me. I mean, the fact that once the rain happened, the tanks had been removed and the building was no longer being used seems significant. If it had been rain when the building was fully in use, 10-inch rainstorm, this may look a little different. I would agree with that, Your Honor. I think the testimony, I mean, the evidence is pretty clear that the tanks were removed within a week after the fires occurred from the plating area, so there was nothing really except residual amounts to wash anywhere in the plating area, in the jobbing, grinding, and polishing areas. You were left with residual dust after cleaning that either were washed away by firefighting or were washed away by the rain. However, there was dust in the plating area, too? There would not have been dust in the plating area because there was no grinding in the plating area. Okay. Unless you have anything you want to add, I think the court doesn't have further questions. Thank you, Your Honors. Thank you. Your Honors, unknowable does not equal trivial. It is the question in the cases say more than theoretical, more than infinitesimal. We have that here. And it's not just one event or two events. It's all the events collectively what make them a substantial factor. So, Your Honors seem to agree that there are occurrences from the fires and the rainstorm. But let's talk about these five to ten sudden and actual events where the containment system gives away. This earthen dam was meant to stop the contamination, to stop, keep everything inside, and only in events where the sewer was overburdened, overwhelmed. That happened only five to ten times. If you look at AH plating, you have similar facts. There were four to five spills and a fire. Here we have five to ten releases through an earthen dam and two fires. There is absolutely a clear path here for finding that these five to ten events were sudden and accidental. Certainly the first one. Certainly the first two. Maybe three. There was a problem once in a while when the sewer couldn't handle the water coming in from the plating operations. When that happened, the water would push towards the side of the building. An earthen dam was put there to stop it, to prevent it. Five to ten times, unexpectedly, it broke through. That is a sudden and accidental event. It contributed to the contamination throughout the site. It should absolutely be considered in your Honor's opinions that it is within the sudden and accidental pollution exclusion. As I mentioned, there are things that occur here that are outside of the pollution exclusion, such as the groundwater. If your Honors don't have any further questions, I appreciate your time and consideration. We appreciate your argument. We appreciate the argument of your opposing counsel. I want to thank both sets of counsel for the briefing and argument. This matter is submitted. Why don't we take a short several minute break before our last case. Thank you all.
judges: BRESS, VANDYKE, Restani